Life. My name is Chris Halpern. I'm the attorney for the appellant, Dr. Francis J. Zambito. If I may, Your Honor, I'd like to reserve three minutes to reply. Thank you, Your Honor. What is clear about this case, and that I think is abundantly clear from the papers that have been submitted, this is a case about a lot of facts that are very common. Very complicated, very confusing, and indeed overwhelming. In fact, in reading the district court's opinion, it became clear that she confused critical facts. The critical fact that the district court misunderstood was what happened with regards to the claim that Dr. Zambito made to Minnesota Mutual, which was a different insurance character. I understand that Judge Cooper was persuaded by the date, December 2, 1991. Exactly. Which I guess she took as a concession, because after all, that was the date that was asserted in the application to Minnesota Mutual. Right. What's wrong with that? The problem with that, Your Honor, is that you have to look to beyond simply the fact that that date was written over and over. We agree with that. It's undisputed that time and again the date of December 2, 1991 was listed as a date in the Minnesota Mutual claim. What's wrong with that is that in coming to the conclusion that Judge Cooper made, she had to ignore all the facts regarding that that simply wasn't true. Yes, we agree that that is evidence. It is evidence that's properly considered by a fact adjudicator, but there was evidence that clearly contradicted it. The rule of law that the district judge applied was, as I understand, didn't make any difference on extraneous factors that under the policy, if the policyholder was working, whether he should have been working or not, if he were working and receiving his pay, he was not disabled under the policy as a matter of law. As a matter of law, that argument is dead wrong. Pardon? As a matter of law, that argument is dead wrong. And so what you're saying now is the judge was wrong, not on the facts. The judge was wrong on the law. I'm saying both. And now, whether or not there's enough, whether or not she's wrong in the law, then it comes down to what are the facts and what law do you apply? And should we do it or do we send it back? Well, I think this court obviously has the obligation and the right to consider this de novo. So why should we? Listen, we don't like de novo. We don't like to be fact-checked. You know that. And I think the district court shouldn't have liked to make it either. Well, the district court hasn't made any findings yet. The district court decides them as a matter of law. You've got to tell us that the law that the district court relied on is wrong and why. Let's look at what Your Honor said. I said this is what you've got to do. Do you disagree with that?  Here is the point that I'm making. When Your Honor brought this point up, what Your Honor said was to be disabled under the terms of the policies, you must show two things. An inability to work that you weren't earning and then that you weren't earning a living, earning money. In making that point, Your Honor confused the difference between a total disability claim under the policies and a partial disability claim under the policies. And Judge Cooper made the same error. Under a partial disability claim, there is an issue with regard to earnings. That's true. The issue doesn't come into play until after the partial disability has been paid for six months. But after it's been paid for six months, it does come into play. Well, the judge here said there was no permanent disability. Therefore, there's no partial disability. I don't know. It seems to me you want to argue a factual case. And I construe the judge's opinion as making a legal decision. And you don't really agree with me, I don't think. Well, I agree that she made an improper legal decision. But I also contend that she did make a factual decision which was wrong and ignored a tremendous amount of facts. And this gets back to the point that was asked in the beginning about the December 2, 1991 date. What happened there is that that particular date in the Minnesota mutual claim was of no significance because there was no issue about nonpayment of premiums on the policies. So that particular date didn't matter. Dr. Zambito went to his psychologist, Dr. Merlin Leach, for the first time on December 2, 1991, and was diagnosed bipolar on that date. That's all that date ever meant was the first date that he was seen by an expert in mental health issues. That's all it ever meant. Well, what do we do with the piece of evidence? Obviously, we're still here on summary judgment. But the fact of the matter is that in the other application, he said date of disability, December 2, 1991. Absolutely. And Mr. Collins, opposing counsel in this case, is a darn good lawyer. And if and when we go to trial in front of a jury, he will be able to use those as arguments that that's the proper date. And he has every right to do that. But what we would ask is that there is abundant evidence that that date isn't true. It simply happened to be the date that was written down because that's the date he first saw Dr. Leach. Dr. Leach wrote it down on that date, and everybody copied it afterwards in all the claims to Minnesota Mutual. That's all that happened. Let me ask you about the legal. I mean, I think you're making this more complicated somehow. Your first statement is that the judge is wrong. You can work and have disability. Okay, so we start there. It seems that this is a little bit more unusual case because it's a doctor working, and the question comes up is if the doctor can't perform competently, is that what these California cases mean about usual or customary way? So it seems to me that that would do you agree that that's a legal issue that we would have to decide? I do, Your Honor. Okay, now let's just assume that we disagree with the way you look at it, and we say, well, we're not going to impute malpractice or those negligence theories into working. If you're working, you know, you're working, and he was working. So in that case, that would be a legal question, correct? Or a legal conclusion? I don't think so. And the reason I don't think so is there's an issue, a factual question, as to whether or not he should have been working, and that comes up under all the different California law cases that were cited, the Ostero case, the Moore case. There's a whole series of them where it's not just whether he was working, but whether it was prudent for him to be working. Our position is — Who gets that out of those cases? Yeah, so that's now you're imputing sort of a prudent. See, he's different. He's like an attorney in many ways. There's a standard of care established in the law, whereas, let's say, a newspaper boy doesn't have a standard of care, okay? So the working kind of sits over here. So we're talking about, as a matter of law, you want us to say that where there's a duty or a standard of care, a legal standard of care, that if there's questions about that person meeting it, that's enough of a factual issue to raise a question as to whether they were disabled, even though they were working, correct? Yes, although I would add to that point, Your Honor, that he had physical problems in addition to mental and emotional problems. He was sued, and one of the people who sued him and made a claim to the dental board said that his hand was shaking, and that ended up causing him to break her jaw while he was extracting a tooth. He had — I don't ever like going to the dentist, but this really cured me again. And, Your Honor, I've made the comment to Mr. Collins, both privately and in our briefs on occasion, that would you have possibly gone to this man? You know he's bipolar. How could you subject yourself to it? It's a terrifying thought. And my argument essentially is, under the policies, despite the fact that he showed up to work, despite the fact that for a period of time he continued to earn money, despite those facts, he should not have been going to work. There is no question that he was incompetent, and he was incompetent because of a mental illness and because of a substance abuse resulting from the mental illness. It doesn't matter under the policies what led to the disability, whether it was the substance abuse or the mental illness. That is a red herring. The fact that he should not have been working is what makes him disabled under the policies. Our position — But isn't the issue more precisely whether or not there was sufficient showing that he was disabled prior to September the 1st? Actually — Yeah. Well, actually, it depends on the policy, Your Honor. There are four policies, and their premium waivers come into — They're all within September? August and September. Okay. Well, I mean, clearly well before December. Yes, Your Honor. Okay. Isn't that all we have here? Yeah. That is a critical issue, Your Honor. And probably that is the most important issue. Our position is that if we have any facts viewed in the light most favorable to us — It gets you back to pre-September. It gets me back. And, in fact, I think it shouldn't go beyond the fact that Northwestern's own in-house psychiatrist, Dr. Logan, agreed that this man was bipolar and should not have been working as of April 1st, 1991. April 1st. This is months before the premium waivers came up. Let me ask you this. The date of December 2nd, 1991, is the date which we have at least when he really quit working. Yes, Your Honor. Now, at that date, were any of the premium waivers in effect of the prior policies? They weren't, because the prior policies — I know the prior policies weren't canceled. They were allowed to run on. Correct. And when was the last date that you could have collected on partial disability on any one of those policies? Was there a policy that was in effect on December 2nd, 1991, of Northwestern? The question that Your Honor poses is a critical question in the case. I know it's a critical question in the case. Otherwise, I wouldn't ask you. Their position on that court — I don't care about their position. Tell me about the policy. Under the policies, all four were still in effect. The reason all four were still in effect on that date is that there was a premium waiver provision which says that if the policyholder is disabled, he need not pay premiums. Our position is he clearly was disabled prior to — Yeah, but you changed my question. I know that that's an issue. I'm saying, was there any policy that was still running on December 2nd, 1991, if that is the actual date of his total disability? Oh, I see what you're saying. If that's the actual date, the answer is no. None of the policies were running. You have to make — at least I know one of these policies was still running when you had the opinion of the psychiatrist from Northwestern that he shouldn't have been working after April. All four were still running in April, Your Honor. April 1991. Yes, Your Honor. All four were still running at that date. What you're saying is, if you could get by the judge's legal decision that she was wrong because there is — that it is not the law that if you collect money and you are still going through the motions of working, you still can get disability. If that judge is wrong, then you've got to — and there may be another date of disability. You've still got a shot in there to collect on the policy. That's exactly what I'm saying, Your Honor. You don't want us to make that decision, do you? What I think is the appropriate thing to do is to make the decision that there is a question — Let me help. That's another problem. Okay. Okay. Well, go ahead. If I think of it, I'll think of it. My only point was, Your Honor, that it's a question of fact. Whether or not — When did you bring — I know what I want to ask you. When did you — when was this action brought? I don't know. It will take me a moment to find it, but I believe early 2000. I believe January 2000. That's my recollection. Oh, okay. So early 2000. You brought the action, and what's the statute of limitations that you're faced with? Well, there are different — Just tell me what the statute says. I know about your claim of insanity and that, but what does the statute say? For the contract action, four years. For the tort action, one of the tort actions, it's three years. The CLRA, the Consumer's Legal Remedies Act. No matter what happens, if you go back, you're going to face a statute of limitations defense. They're not likely to waive it. They're going to continue. The answer is yes. Yeah. All right. A little trouble answering a question. I'm sorry, Your Honor. Okay. I'm sorry. I'm not sure how much time I have left. Just under four minutes. Okay. So I'll just go for one quick minute. Do I have a clock here that says 3.53 on the clock? Yeah, and I was having just trouble understanding. Okay. Thank you. It's counting downward. Yeah, go ahead. Thank you. The only point that I wanted to make, and this, I guess, gets to the question about the time limitation issues, our position is that as a matter of law, the statute of limitations doesn't begin to run until the claim was actually denied, which did not occur until late 1999. We filed just a few months after the claim was denied. But the statute of limitations issue isn't presented in this case, is it? No, it's not on this appeal. But that would arise in a trial if we were to send it back. Exactly right. It was asserted. It was asserted. And the court didn't decide that. Exactly right. And they've made the – taken the position, and this is now discussed a little bit in the briefs, that there was a notice of claim requirement that was violated, and we've simply said, unless they can show prejudice as a matter of law, that gets them nowhere, and they haven't shown any actual prejudice. You're down to just under three. Did you want to reserve that? Yes, I did, Your Honor. Thank you very much. Good morning, Your Honor. Phil Collins for the Apelli Northwestern Mutual Life Insurance Company. I believe that the – Is Northwestern Mutual out of Minneapolis? No, it's out of Milwaukee, Your Honor. Yes. Minnesota Mutual, which was the carrier that replaced the NML policies, is out of Minneapolis, I believe. I think that the court's inquiry begins and ends here with the following question. Did Dr. Zambito present evidence, admissible evidence, that would establish that he suffered from a disability within the meaning of the policies before those policies lapsed, the last of which lapsed on September 5, 1991? And I believe the answer to that question is there was no such admissible evidence presented. What about the April finding from the insurance company psychologist? Two things about that. It was not a finding of disability. What it said was that after he had reviewed certain things, including things that the U.S. District Court and the Utah Court had refused to consider, declarations of doctors who hadn't even been there at the time but who were saying things after the fact, well, this must have been what he was like. But that's what Dr. Lowe viewed, and what he concluded was it seemed as though he was significantly impaired as of April 1991. Well, doesn't that contribute to the fundamental question we have here, which is whether there are genuine issues of material fact? Isn't that something that could be introduced before a trier of fact? Well, the Court was aware of this, Your Honor. The Court took this into consideration and decided that it did not raise a tribal issue of fact. But why not? I mean, the Court could be wrong. On that point, we have to look at it de novo. And so I think what you need to tell us is why, with all the complaints about him and with this psychiatrist saying that he was impaired, even though you might say that it's attenuated because it's based on these other people who didn't actually observe him, we don't really weigh that evidence. Don't we just say, well, that is enough to raise a material issue as to disability? Is it not? Well, I think it's not. But I agree you don't weigh the evidence here. The reason I think it doesn't bear on the question of disability is because it's not a finding of disability. Disability, as defined in the policies consistently with Erica and so on, is an inability to perform some or all of the principal duties of the man's occupation. That's not what Dr. Logan said. Dr. Logan's memo just — and by the way, that wasn't written, Your Honor, until 1998. So he wrote that he came to that conclusion after reviewing these records, which I would say the records were incompetent and inadmissible anyway that he based that on. But he did not make a finding that in April 1991 that Dr. Zambito was tabled. He merely was saying the man had an illness going on there, at least it appears that way from what he's reviewed. But why isn't that — I mean, that kind of goes to the heart. I don't know if it will pan out or not, but why isn't that the heart of the matter as to whether this doctor could really practice in the standards of medical care that he's required to observe under his medical license? If he's impaired — some people are impaired and do quite well, as you know, but others do not. So why doesn't that just raise a question that needs to be decided? Well, I think it does raise a question, but I think that question was decided correctly as a matter of law from the admissible evidence before the trial judge. But at least that's not admissible? I'm saying that that's not — what Dr. Logan did was to not — he did not make a finding that there was disability that existed as of April 1991. And by the way, even if he did, there's no finding that that disability continued after April 1991 and was in existence when the policies lapsed in September of 1991. Remind me of the circumstances of Dr. Logan's involvement in this. What precipitated that? After there was a claim finally submitted by Dr. Zambito to Northwestern, a signed claim that they received on September 8, 1998, so seven years after he stopped working on December 1, 1991, after that claim was made and signed by Dr. Zambito, then the company investigated. With his signature, they had the ability to obtain records from other people and so on because a signature on the claim form constituted — Yeah, but what triggered Dr. Logan's involvement? What was it that — Oh, I understand. The company's — one of the company's claims examiners wanted Dr. Logan's opinion as to whether there was an illness as of April 1991, which is what Dr. Zambito was at that time claiming. Yeah, but was there an event in April of 1991? No, there wasn't other than — well, in a sense, there was. That's when he applied for the Minnesota Mutual policies in April 1991. And, of course, Dr. Zambito, long after the fact, was saying, in April 1991, I was completely incapacitated mentally and I did not have the capacity to form the intention to defraud Minnesota Mutual. All right, so that's helpful. In other words, Dr. Logan is making this judgment in 1998 or so based on an examination of what in 1991? Declarations from people like Dr. Hirsch, who didn't even first treat Dr. Zambito until March of 1992, declarations from McElhaney, who was not even a psychiatrist, and so on. But that really goes to credibility. I mean, in all these cases, the medical evidence is based largely on people who never saw the patient other than one or two treating physicians. And some of it is sketchy at best, but isn't that really — doesn't that go to the weight of the evidence? In other words, it's all sort of sticking up there. And how it resolves itself is a factual issue, is it not? Not in this case, in my opinion. And the reason is because the facts in this case as to what was really going on in April 1991, May of 1991, when he was applying for the Minnesota Mutual policy, the facts are completely clear and the facts are not in dispute. The facts are that he underwent an examination by Dr. McElhaney in April of 1991. That's in the supplemental excerpts of record. Dr. McElhaney didn't find anything wrong with him at that time. Dr. McElhaney also treated this man in August of 1991. But what did he treat him for? He treated him for a sore throat and blocked ears. And this is in the supplemental excerpts of record. And Dr. McElhaney put him on antibiotics and said, don't fly. There is no — He's just a general practitioner, Your Honor. But is there — are there declarations or other evidence offered that suggests that during this period he did have some kind of a mental or other disability? The only declarations are from people who were not there at the time and who are looking backward in time, even though they didn't treat him for that at the time. And that's my point is that — that's what I want — I think that that's where I come up with saying, well, that just raises a factual issue. In other words, to adopt your position, we would have to say, ignore those declarations because they're, you know, litigation-prone after the fact. And the only person who saw him didn't find that there was a problem. And ignore them because they don't go to the issue that's in front of this court, and that is, was there a disability? This court is not trying to determine if there was an illness. Well, but if the impairment is tantamount to a disability, isn't that then a legal determination on the basis of the facts? In other words, they don't have to actually make the final legal conclusion, do they, in those declarations in order for there to be a factual issue? The final legal conclusion or the final coverage conclusion is made by the claims examiner. Was there a disability within the meaning of the policy? And that's the conclusion that the trial court addressed and decided there had not been evidence of disability, even though there was evidence of an illness, and there was even evidence that he had been sued a couple of times before, based on acts before the policy's lapse. But that's an interesting point to look at also, Your Honor, because the last allegedly negligent acts that any patient alleged that Dr. Zambito committed were committed in June and July of 1991. That was with respect to Betty N. And he continued to work full-time from July 91 all the way through to, if you believe the date of December 2, I think that's an accurate date, December 2, 1991, which is all over the face of all the attending physician statements, and it's in Dr. Zambito's own claim where he said, I didn't significantly curtail my duties until December. Actually, he says until after December 1991. Okay. Can you help me then? Sure. I think I understand what you're saying is that if you credit all those declarations, that they just don't go far enough to raise a factual issue. Is that what you're saying? Right. I'm saying both things. Number one, they're incompetent, and number two, they're irrelevant, because even if you do credit them, they don't go to the issue of facility. They go to the issue of illness, and that's not what this case is all about. You agree that what we should do in considering this case is to forget about the Minnesota Mutual policy. The question is, if he had just done what he did, but never went to Minnesota Mutual, and he brought his action when he did, can he make a case against you folks? And the way I see it, as I mentioned before, and maybe I'm wrong, I didn't understand that the district court made a factual determination of saying there's no evidence that he was disabled. What the district court did, contrary to some case law in California, is to say if he actually was performing the task and didn't get a reduction in income, he's not disabled. That's what I understood the court really had to say. I may be wrong on that, but that's my view. Well, the way I understood the court's decision, Your Honor, is that it said two things. He hasn't come forward with any evidence to support a finding of total disability, and total disability would require a showing that you're unable to perform the substantial and material or principal. He had a bipolar problem, mental problem. We know it was in effect on December 1, 1991, but we all know that mental problems don't happen just like that. Sure. And so there is the possibility that Adam had a problem when he was having all of this malpractice claims made against him, when he was actually drilling teeth, but doing it in such a terrible way it shouldn't count in dentistry. But he got paid for it. He did, and he worked full time at it. Under California law, the fact that you get paid on your job, if you can't do it, you can still collect disability insurance. I'm sorry, I didn't hear that. I'm sorry. Under California law, if you're getting paid on your job, even though you don't do anything, that doesn't disqualify you. Oh, I agree with you. I agree with that. What disqualifies him here is that the very, very slim evidence that he did produce of practicing negligently is not enough to establish that he was unable to perform any... He says it's an evidentiary issue, and there's no evidence to show either partial or permanent disability during the policy period. That is correct. There was no... That is correct. It focuses on the evidence, and I said the law. Okay, I got your position. Okay, thank you. Well, let me ask you about the law, because it seems like it is tied in with the evidence in a way. If you take these cases that you cited, and I believe the district court did, that to show the disability, you have to show you can't, you're unable to perform the substantial material acts in the usual and customary way. So the question I have is if you have a mental impairment or you have evidence here that there was alleged malpractice, for example, in June of July, is that practicing in the usual and customary way? Sure. Of course it is. Everybody, every professional is going to make a mistake at some time or another, and that mistake is not going to render that person disabled to practice his profession. And that's the real problem that I see with the relevancy of the information that was brought forward. I won't call it evidence, because I don't believe it's there in evidentiary form, but the information regarding illness and regarding isolated examples of negligent treatment. This is not a health policy, and it's not a professional liability policy that's to protect him from liability events like negligent treatment. It's a can you do your job, and there's no evidence here to create an issue of fact that he was unable to perform the principal duties of his occupation when these policies lapsed. Even if you take those doctors' statements about mental impairment, they're not linked in any evidentiary manner to performing the occupation. That's right. And basically what those doctors were trying to do was they were trying to help Dr. Zambito get around the problem that he had with Minnesota Mutual, because the trial judge in the U.S. District Bankruptcy Court, Judge Russell, decided that Dr. Zambito intended to defraud Minnesota Mutual by not revealing on the policy app that he had been treated at St. John's for two weeks in January 1990 for substance abuse. He covered that up, and he lied about it in the application. And so counsel for Dr. Zambito, after the judgment in favor of Minnesota Mutual for the $500,000, allowing them to get their money back, he tried to put forth declarations from these two doctors, Hirsch and McElhaney and one other, three doctors, that basically said, we don't think Dr. Zambito could have formed the intent to defraud Minnesota Mutual back then in April of 1991, because he was having a mental illness going on. And Judge Russell said, no, I saw the man testify. I observed what he was like, and I'm positive that he did intend to defraud Minnesota Mutual. I was Judge Barry Russell. Then that decision was appealed to Judge Lew of the U.S. District Court Central, and Judge Lew read the record, and Judge Lew said, first of all, it was correct not to introduce those two declarations from those doctors, because McElhaney was not competent because he wasn't a psychiatrist, and Hirsch didn't see him until a year after he was saying he was, you know, theorizing about what his condition had been a year earlier. And then Judge Lew went on to say, and I read the record, and I saw instances in the record where Dr. Zambito was testifying, and this is in 1996, where he catches himself before he's about to make a statement against interest. And so Judge Lew decided, no, I don't buy this. He was too incapacitated either. So basically, I think the court's inquiry here should not be, was there an illness that preexisted September 5, 1991, the last dates, the latest of the last dates, but was there a disability? And I think that the evidence that was produced to the trial court and the same evidence that's here shows that there is no material issue of fact on that point. Yes, he may have been suffering from an illness. There is no evidence that the illness had reached the point in his practice where he was unable to perform any of the substantial and material duties in the customary and usual way. Yes, they certainly do. And bipolar is one of those things. Somebody has to call every patient he ever had and say, well, what happened? You can prove that he did a good job on this patient, filling this tooth, and malpractice the next one. That question. And at the very least, respectfully, I would submit that there was a genuine issue, sorry, that there is no, I'm talking about coverage and bad faith here. There was no question that this company had the right to decide what it did without running afoul of bad faith law, because at the very least there's a genuine issue as to whether there was or was not coverage. So you don't get to bad faith and punitive damages and all of that unless you show that the company did not have proper cause to do what it did. And I'm suggesting to your honors that there was abundant proper cause here for the company to decline this claim. And even if there should be, your feeling would be that this thing should be reversed and sent back on the contract issues of was he disabled, it should not be sent back on the issues beyond the contract issue. In other words, bad faith and punitive damages. And I don't mean to suggest by that that I think it should be sent back. Thank you, Counselor. Okay. This is a case like so many cases where the plaintiff maybe is the colonel of one case and puts in 50 others and confuses all of us judges. Thank you, Counselor. Your time has expired. Thank you, Your Honor. You'll hear from Mr. Halpern. You have a little bit of reserve time. And let me just take a cue from your opposing counsel. What is your strongest showing that there was a disability within the meaning of the policy prior to September of 91? Dr. Zambito was ordered by the California Board of Dental Examiners to go into St. John's Mental Health Center for substance abuse treatment in January of 1990. Dr. Zambito had four of his office staff write anonymous letters to the California Attorney General saying that this man was suicidal and incompetent to practice dentistry and they needed to stop him. That is what led to the Board of Dental Examiners looking at his ability to practice medicine. The fact that this now was... In other words, you're saying the evidence of the January 1990 substance abuse treatment constitutes disability. Absolutely. And the fact that Dr. McElhaney, his primary care physician, also had him, on order of the Board of Dental Examiners, treated once a month for blood testing to see what was going on with his substance abuse. The fact that Dr. McElhaney was treating him, discussing with him regularly what was going on, whether he was competent to practice dentistry. How does that show September... Go ahead. I think we're saying the same thing. That's January of 1990 he goes in and then he comes out. But we're looking at April and September dates, 1991. And since things can come and go, what evidence do we look to on those dates? Your Honor made an assumption there. Things can come and go. They can't. Bipolar disorder is a chronic illness. It doesn't come and go. Yes, its symptoms go up and down. That's true. And if the district court had read our expert opinions that we submitted, the district court, which refused to consider those expert opinions, would have understood this point. The point being, he was ill well before April of 1991. In that case, you're just saying that if he had a bipolar disorder, he was per se disabled. That's your position? No, I'm not saying that. I'm not trying to say that anybody who is diagnosed bipolar is per se disabled. I'm not saying that. What I'm saying is you have to look at the facts to see whether that individual, under that illness and the way that individual was handling the illness, was in fact disabled. Okay, so now I go back to my question. What is the evidence on the dates in question? The evidence is that this man, in opposition to what Northwestern's counsel is saying, wasn't showing up and working regularly. He was constantly running out, not showing up to work. There is a factual question as to what. Doesn't the evidence also show that he, in fact, was treating patients during this whole time? Yes, and he was. And the problem is, for example, Judge Bright said, I guess we'll have to call all of his patients to ask them one by one how he was treating them during this period of time. I would submit that's not what we have to do. The fact is we know that he was incompetently treating many patients during this period of time. But does incompetent treatment equal disability? Yes, and the reason it does is because of the nature of the incompetent treatment. This wasn't simply a guy who was negligent once in a while. This was a guy who every time a patient walked in his office and sat down in that chair, that patient was at risk. Was he able, on occasion, to do the job? Yes. I would say there probably are patients who were not harmed by him during this period of time. But I would add that every single one of those patients was at risk because the nature of the illness is unpredictable. It could have happened to any patient at any time. That's the basic fact. You're really good. That is not an answer of disability. That answers whether he was of competency. And you're saying, yes, he was competent sometimes. No, he wasn't competent on other times. No, I'm saying, yes, his actual efforts were satisfactory and sufficient on occasion, but that they were not on other occasions. Listen, any time you walk into a professional's office, you could be at risk for either illness or stupidity. But if, in fact, that doctor has a chronic disease, which can at any time render him or her incompetent to do that job, they should not be practicing, and they have a right, if they have disability coverage, to obtain those benefits. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and the court will adjourn. All rise. This court for this session stands adjourned.
judges: Bright, O'scannlain, McKeown